# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHAWN HAMPTON,** | : | **CIVIL ACTION NO. 1:14-CV-1367** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **JOHN WETZEL,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Shawn Hampton ("Hampton"), an inmate currently confined at the Rockview State Correctional Institution in Bellefonte, Pennsylvania ("SCI-Rockview"), commenced this action on July 17, 2014 pursuant to 42 U.S.C. § 1983. (Doc. 1). The matter is proceeding *via* an amended complaint, wherein Hampton alleges that defendants' failure to provide him adequate medical services violated his rights under the First, Eighth, and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act. (Doc. 13). Remaining defendants are Wetzel, Williams, Harpster, Glunt and McHenry (collectively, "Commonwealth defendants"), and Bernard and Koltay, physician assistants at SCI-Rockview.[1]

---

[1] By memorandum and order dated March 2, 2016, the court dismissed all claims against defendant Corizon Health Care Service. (Docs. 63-64). The only remaining claim against defendants Bernard and Koltay is an Eighth Amendment inadequate medical care claim for discontinuing Hampton's prescription for Tylenol and failing to re-issue his back and wrist braces after they were confiscated. (Id.) The present motion filed on behalf of the Commonwealth defendants is their first dispositive motion.

Before the court is a motion (Doc. 71) for summary judgment pursuant to Federal Rule of Civil Procedure 56 by the Commonwealth defendants, and a motion (Doc. 73) for summary judgment pursuant to Federal Rule of Civil Procedure 56 by defendants Bernard and Koltay. For the reasons set forth below, the court will grant both motions.

## I.    **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

## II.  **Statement of Material Facts**[2]

Hampton has been incarcerated at SCI-Rockview since May 2007.  (Doc. 72 ¶ 1; Doc. 89 ¶ 1).  Hampton has ostensibly suffered from low back pain for several years.  (Doc. 72 ¶ 2; Doc. 89 ¶ 2).

Hampton first presented to sick call with complaints of back pain on May 6, 2010.  (Doc. 74 ¶ 4).  On examination, the medical provider noted that Hampton had full strength and found no non-anatomical tenderness.  (Id.)  The medical provider ordered an x-ray of the lumbar spine.  (Id.)  The x-ray revealed mild degenerative disc disease at the lumbosacral joint.  (Id.)

On June 23, 2010, Hampton presented to sick call with complaints of left wrist pain after scooping oatmeal.  (Id. at ¶ 5).  He reported that the pain was exacerbated by dorsi-flexion exercises, and ibuprofen did not relieve his pain.  (Id.)  Examination revealed full range of motion and strength.  (Id.)  The medical provider diagnosed

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial.  See id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 72, 74, 89).  Hampton did not file a response to Bernard and Koltay's statement of material facts.  In his brief (Doc. 82) in opposition to their Rule 56 motion, Hampton includes his own factual assertions, but his enumeration is not responsive to Bernard and Koltay's statement of facts.  The court accordingly deems the facts set forth by Bernard and Koltay to be undisputed.  See LOCAL RULE OF COURT 56.1.

To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

3

Hampton with left wrist pain and possible tendonitis and recommended that he continue taking non-steroidal anti-inflammatory medications ("NSAIDs"). (Id.) Hampton returned to sick call on July 12, 2010, again complaining of left wrist pain. (Id. ¶ 6). During this visit, Hampton treated with physician assistant ("PA") Julie Pensiero. (Id.) Hampton reported that his pain improved when he stopped the repetitive job of scooping and began wrapping his wrist with an ACE bandage. (Id.) An examination of Hampton's wrist revealed full range of motion and full strength. (Id.) PA Pensiero diagnosed left wrist pain with possible overuse syndrome and recommended that Hampton continue using the ACE wrap. (Id.)

On August 24, 2010, Hampton presented to sick call requesting a bottom bunk due to low back pain. (Id. ¶ 7). He denied a recent injury to his back. (Id.) He stated that the only prior injuries to his back occurred when he fell down a flight of stairs when he was ten years old and thirteen years old. (Id.) Hampton reported that he was taking Motrin for pain, which he purchased from the commissary. (Id.) PA Pensiero examined Hampton and noted that he was able to ambulate without difficulty, exhibited no muscle spasms, had full range of motion and strength, and was able to move without pain. (Id.) PA Pensiero found no indication for a bottom bunk. (Id.) PA Pensiero ordered Hampton a back brace and encouraged him to perform stretching and range of motion exercises. (See id.) Hampton received the back brace on September 1, 2010. (Id. ¶ 8).

Hampton next complained of back pain on February 1, 2011, after a reported fall. (Id. ¶ 9). Nurse B. Dunlap treated Hampton, and noted that examination was unremarkable and Hampton did not appear to be in distress. (Id.) Nurse Dunlap

advised Hampton to rest and gave him Motrin for pain.  (Id.)  Shortly thereafter, on February 24, 2011, while on a hunger strike, Hampton was evaluated by Nurse Robert Somich.  (Id. ¶ 10).  Hampton told Nurse Somich: "All I want is bottom bunk."  (Id.)  He reported that he would eat once given a bottom bunk restriction.  (Id.)  Hampton was also seen by a PA, who reviewed his most recent x-ray and observed that it revealed only mild degenerative disc disease.  (Id.)  Therefore, the PA did not believe that a bottom bunk restriction was medically necessary.  (Id.)  Although the record on this point is unclear, Hampton did receive a bottom bunk restriction at some point after the February 2011 visit.  (See Doc. 74 ¶ 11; see also Doc. 72 ¶ 4; Doc. 89 ¶ 4).

In September 2012, Hampton requested to have his activity restrictions lifted so that he could go to the gym to exercise and adhere to his treatment program.  (Doc. 72 ¶ 3; Doc. 89 ¶ 3).  The Commonwealth defendants aver that medical staff offered to lift Hampton's physical restrictions, but he declined the offer because he did not want to lose his bottom bunk status and extra pillows.  (See Doc. 72 ¶ 4; Doc. 89 ¶ 4).  Hampton explains that he did not want to sign off on all restrictions because "***ALL*** of them were not the problem."  (Doc. 89 ¶ 4).

Hampton next presented to sick call on January 28, 2013 and was seen by defendant Bernard.  (Doc. 74 ¶ 11).  Hampton requested to sign up for "rehab gym."  (Id.)  Bernard advised Hampton that if his activity restrictions were lifted, his bottom bunk restriction and double pillow order would likely be discontinued.  (Id.)  Hampton did not want to change his housing accommodations, and his restrictions

remained the same. (Id.) On April 17, 2013, medical staff issued Hampton his first back brace, with a review date of October 17, 2013. (Doc. 72 ¶ 5; Doc. 89 ¶ 5).

On September 4, 2013, Hampton submitted a sick call for a replacement back brace and treated with defendant Koltay. (Doc. 74 ¶ 12). Hampton reported that the brace provided him with pain relief and that, with the brace, he had less need for NSAIDs. (Id.) After examination, Koltay ordered Hampton a new back brace. (Id.) Staff issued a replacement back brace to Hampton on September 18, 2013, with a reevaluation date of March 18, 2014. (Doc. 72 ¶ 6; Doc. 89 ¶ 6).

On October 7, 2013, Hampton filed grievance number 480803, wherein he complained that his restrictions were not up to date in the prison computer. (Doc. 72 ¶ 7; Doc. 89 ¶ 7). Hampton requested that his restrictions be updated to include no repetitive motion so that his work supervisors would know which duties he was able to perform. (Id.) The grievance officer denied Hampton's initial grievance and found that the restrictions noted in the computer were correct and no doctor ever ordered "no repetitive motion" of the hands. (Doc. 72-1 at 347). Hampton appealed to the Facility Manager, seeking compensation for pain suffered "when forced to do things that cause [him] pain." (Doc. 72 ¶ 8; Doc. 89 ¶ 8; Doc. 72-1 at 346). The Facility Manager denied the appeal. (Doc. 72-1 at 345). The institution's findings were thereafter upheld on final review. (Doc. 72-1 at 342-44).

On October 11, 2013, Hampton returned to sick call and was again seen by defendant Koltay. (Doc. 74 ¶ 13). Hampton requested a clarification regarding his medical restrictions. (Id.) He reported that corrections officers told him that he was not allowed to have carpal tunnel braces. (Id.) Hampton therefore wanted to

6

have this equipment verified. (Id.) Koltay wrote an order with an instruction to "confirm [that] carpal tunnel braces are included in patient's equipment list." (Id.)

On November 6, 2013, Hampton was seen by defendant Bernard in sick call. (Doc. 74 ¶ 14; see Doc. 72 ¶ 9; Doc. 89 ¶ 9; Doc. 72-1 at 72). Hampton complained that he was unhappy with his new back brace because it was not tight enough. (Doc. 74 ¶ 14). Upon examination, Bernard noted that Hampton was not wearing the brace correctly and instructed him how to use the brace properly. (Id.; see Doc. 72 ¶ 9; Doc. 89 ¶ 9; Doc. 72-1 at 72). Bernard noted that there was no need to replace the brace at that time. (Doc. 74 ¶ 14). Hampton contends that he was not wearing the brace incorrectly. (Doc. 89 ¶ 9). On November 19, 2013, defendant Koltay wrote a renewed instruction reminding the nurses to include the carpal tunnel braces and back brace in Hampton's equipment list. (Doc. 74 ¶ 15).

Defendant Koltay next saw Hampton on January 21, 2014, for complaints of pain due to carpal tunnel syndrome. (Id. ¶ 16). Hampton stated that he recently started a new job involving repetitive movement. (Id.) He further stated that he was never issued carpal tunnel braces. (Id.) Hampton reported bilateral pain that was greater in his dominant right wrist. (Id.) Koltay noted no recent complaints of carpal tunnel syndrome and ordered a trial of wrist splints. (Id.; see Doc. 72 ¶ 10; Doc. 89 ¶ 10). Koltay also updated Hampton's medical restrictions to reflect that Hampton should avoid activities with repetitive motion. (Id.) On February 7, 2014, wrist splints were issued to Hampton, with a review date of August 7, 2014. (Doc. 72 ¶ 11; Doc. 89 ¶ 11).

On February 18, 2014, Hampton was placed in the RHU at SCI-Rockview. (Doc. 72 ¶ 12; Doc. 89 ¶ 12). Prior to entering the RHU, Hampton was subjected to a strip search. (Doc. 72 ¶ 13; Doc. 89 ¶ 13). During the search, Hampton gave his back brace to correctional officer Montgomery under the supervision of Lieutenant Smith. (Doc. 72 ¶ 14; Doc. 89 ¶ 14). Defendant McHenry was not present for Hampton's search on February 18, 2014. (Doc. 72 ¶ 15; Doc. 78 ¶ 15). The parties dispute whether defendant McHenry was ever in possession of Hampton's back brace and wrist splints. (Doc. 72 ¶ 16; Doc. 78 ¶ 16). According to Hampton, his back and wrist braces were confiscated by prison staff pursuant to DOC policy. (See Doc. 74 ¶ 17).

The parties agree that Hampton packed his own property in preparation for transfer to the State Correctional Institution at Benner ("SCI-Benner"). (Doc. 72 ¶ 17; Doc. 89 ¶ 17). On February 25, 2014, Hampton was transferred to the RHU at SCI-Benner and remained there until he was transferred back to SCI-Rockview on March 14, 2014. (Doc. 72 ¶ 18; Doc. 89 ¶ 18). Hampton's property was inventoried at SCI-Rockview on March 18, 2014. (Doc. 72 ¶ 19; Doc. 89 ¶ 19). Hampton contends that his belongings were sent to the property room because he refused to downsize his property within a time frame ordered by defendant McHenry. (Doc. 89 ¶ 19).

Hampton first noticed that he did not have his back brace and wrist splints during the March 18, 2014 inventory. (Doc. 72 ¶ 20; Doc. 89 ¶ 20). He immediately filed grievance number 504282 complaining that McHenry had confiscated and destroyed his braces and failed to provide him with a notice of confiscation form.

(Doc. 72 ¶ 21; Doc. 74 ¶ 18; Doc. 89 ¶ 21).  Hampton also requested replacement braces.  (Doc. 72 ¶ 21; Doc. 89 ¶ 21).

The Department of Corrections ("DOC") received the grievance on April 4, 2014.  (Doc. 72 ¶ 21; Doc. 89 ¶ 21).  The Grievance Coordinator rejected same as untimely and for failure to provide required documentation.  (Doc. 72 ¶ 22; Doc. 89 ¶ 22).  Hampton appealed to the Facility Manager and then to the Secretary's Office of Inmate Grievances and Appeals, and both upheld the Grievance Coordinator's response.  (Doc. 72 ¶ 23; Doc. 89 ¶ 23).  The Facility Manager noted that Hampton failed to resubmit his appeal with proper documentation.  (Doc. 72 ¶ 23).  Hampton responds that he could not afford to make required copies.  (Doc. 89 ¶ 23).

Hampton failed to show up for sick call on March 20, 2014.  (Doc. 72 ¶ 24; Doc. 89 ¶ 24).  Hampton contends that he did not personally put in a sick call slip on this date; rather, a nurse submitted the call on his behalf after he suffered an asthma attack.  (Doc. 89 ¶ 24).  Hampton explains that he suffered an asthma attack, he was provided an inhaler which resolved his problem, and he was "fine."  (Id.)  Thus, Hampton did not show up for the scheduled sick call because he did not want to "waste the PA[']s time with an under control issue."  (Id.)

On May 8, 2014, Hampton reported to defendant Koltay that his medical equipment was confiscated when he was in the RHU.  (Doc. 74 ¶ 19).  Hampton requested a replacement back brace and wrist splints.  (Doc. 72 ¶ 25; Doc. 89 ¶ 25).  Koltay explained that, pursuant to DOC policy, she could not provide him with new braces unless he had a confiscation slip.  (Doc. 74 ¶ 19).  Koltay advised Hampton to contact the security office for a confiscated items receipt to obtain replacement

braces.  (Id.)  Hampton states that this was not the first occasion that he requested a replacement for his back brace and wrist splints.  (Doc. 89 ¶ 25).

On May 19, 2014, Dr. Michael Ekizian wrote a progress note in response to Hampton's request for the return of his back brace.  (Doc. 74 ¶ 20).  Dr. Ekizian did not see Hampton but did review his chart.  (Id.)  His review indicated complaints of chronic lumbago and degenerative disc disease and that Hampton was taking NSAIDs.  (Id.)  Dr. Ekizian concluded that Hampton should "continue back brace for now."  (Id.)  He noted that Hampton's "significant [complaints of] back pain were out of proportion to [the] objective findings."  (Id.)

Dr. Ekizian evaluated Hampton on June 3, 2014 for complaints of lumbago. (Doc. 72 ¶ 26; Doc. 74 ¶ 21; Doc. 89 ¶ 26).  Dr. Ekizian noted that Hampton did not want medication and was already using a back brace.  (Doc. 74 ¶ 21).  He observed that previous lumbar spine x-rays revealed only minimal findings of degenerative disc disease and that Hampton reported muscle spasms.  (Id.)  Dr. Ekizian ordered a back brace, prescribed Tylenol and NSAIDs, and recommended physical therapy. (Id.; see also Doc. 72 ¶ 26; Doc. 89 ¶ 26).  Dr. Ekizian noted that Hampton's previous brace was confiscated during his transfer to the RHU.  (Doc. 74 ¶ 21).  Dr. Ekizian also submitted a consultation request for a physical therapy evaluation.  (Id. ¶ 22). Therein, Dr. Ekizian explained that Hampton suffered from mild degenerative disc disease of the lumbosacral spine with muscle spasms and was using a back brace for chronic pain.  (Id.)  Dr. Ekizian's order was reviewed and approved for physical therapy the following day.  (Doc. 72 ¶ 28).  Hampton admits that he received the Tylenol and back brace ordered by Dr. Ekizian.  (Doc. 89 ¶ 28).  The parties dispute

whether Hampton spoke to Dr. Ekizian about wrist pain or wrist splints during the June 3 visit. (Doc. 72 ¶ 27; Doc. 89 ¶ 27).

On June 23, 2014, Hampton was seen by defendant Bernard for complaints of migraines. (Doc. 74 ¶ 23). Hampton requested that Bernard specially designate his Tylenol as "keep on person" in lieu of compelling Hampton to go to the pill line. (Id.) Bernard informed Hampton that, because he was on the D mental health roster, he was not permitted to have any medications as "keep on person" with the exception of inhalers. (Id.) The progress note does not indicate that Hampton requested a prescription for Tylenol or that Bernard instructed him to purchase Tylenol from the commissary. (Id.)

Hampton was seen by Bernard for a refill of his inhalers on July 19, 2014, at which time he inquired about his back brace and wrist splints. (Doc. 72 ¶ 29; Doc. 74 ¶ 24; Doc. 89 ¶ 29). Hampton reported that he did not have his braces for a few months, and Bernard observed that Hampton had been without braces since May 2014. (Doc. 74 ¶ 24). The parties dispute whether Hampton told Bernard he was able to use a typewriter and write letters. (See Doc. 72 ¶ 30; Doc. 89 ¶ 30). Bernard advised Hampton that there was no indication for wrist splints and encouraged him to use Tylenol. (Doc. 72 ¶ 31; Doc. 74 ¶ 24; Doc. 89 ¶ 31). She noted that Hampton did not complain of symptoms related to carpal tunnel. (Doc. 74 ¶ 24). She also noted that a physical therapy consultation was pending and she would wait for the evaluation before making any determinations regarding a back brace. (Id.; see Doc. 72 ¶ 31; Doc. 89 ¶ 31). Hampton contends that Bernard discontinued his Tylenol prescription during this visit. (Doc. 89 ¶ 31).

Hampton treated with a physical therapist on July 30, 2014. (Doc. 74 ¶ 25; <u>see</u> Doc. 72 ¶ 32; Doc. 89 ¶ 32). The physical therapist noted that Hampton experienced right lower back pain that sometimes traveled to the right scapular region. (Doc. 74 ¶ 25). Hampton reported suffering from this pain for twelve to thirteen years. (<u>Id.</u>) He did not report wrist pain during this visit. (<u>Id.</u>) No recommendation was made for back or wrist braces, and no follow-up was recommended. (<u>Id.</u>)

The physical therapist also instructed Hampton about a low back flexibility program and provided him with a rehabilitative exercise program. (<u>Id.</u>; Doc. 72 ¶ 32; Doc. 89 ¶ 32). Hampton asserts that he was interested in "any" program that would help his back and wrist pain. (Doc. 89 ¶ 32). The order for the rehabilitative exercise program stated: "An inmate involved in this program may not participate in Varsity Sports, Intramural Activities, Indoor Weights, over 40 gym sessions or over 50 gym sessions." (Doc. 72 ¶ 33; Doc. 89 ¶ 33; Doc. 72-1 at 38).

On September 22, 2014, defendant Koltay treated Hampton for complaints of bilateral wrist pain and headaches. (Doc. 72 34, Doc. 74 ¶ 26; Doc. 89 ¶ 34). She noted a history of carpal tunnel syndrome and that Hampton's symptoms were aggravated by recurrent, repetitive motion. (Doc. 74 ¶ 26). Hampton reported no relief from non-aspirin medication available at commissary. (<u>Id.</u>) Koltay issued an order for bilateral wrist splits and a trial of Tegretol for pain relief. (<u>Id.</u>; Doc. 72 ¶ 34; Doc. 89 ¶ 34). Koltay otherwise continued Hampton's current restrictions and advised him to follow-up as needed. (Doc. 72 ¶ 34; Doc. 89 ¶ 34). Hampton would continue taking Tegretol through June 3, 2015. (Doc. 74 ¶ 26).

Hampton again treated with defendant Koltay for complaints of headaches on October 20, 2014. (Id. ¶ 27). He did not report any other pain to Koltay at that time. (Id.) Koltay continued Hampton's Tegretol prescription for pain. (Id.) On December 3, 2014, defendant Bernard advised Hampton to treat his headaches with Tylenol, which he could obtain from the commissary. (Id. ¶ 28).

On February 26, 2015, Hampton saw PA Hans Reisinger for complaints of headaches. (Doc. 72 ¶ 35; Doc. 89 ¶ 35; Doc. 72-1 at 45; see Doc. 74 ¶ 29). Hampton requested a review of his restrictions and documentation of the wrist and back brace orders from the medical department. (Doc. 72 ¶ 35; Doc. 89 ¶ 35). Hampton reported that he was taking Tegretol and Tylenol for his headaches, and Reisinger added Excedrin PM to his regimen. (Doc. 74 ¶ 29). The February 26, 2015 visit was the first time Hampton was seen in medical for back complaints since July 30, 2014. (Doc. 72 ¶ 36; Doc. 89 ¶ 36).

On April 19, 2015, Hampton submitted an Inmate Request to Staff Form requesting treatment for back and wrist issues. (Doc. 72 ¶ 37; Doc. 89 ¶ 37). In response, Hampton was scheduled to see Dr. Philip Scaglione, with whom he treated on April 27, 2015. (Doc. 72 ¶ 39; Doc. 89 ¶ 39). Dr. Scaglione ordered a lumbosacral brace, a double mattress and double pillows, and physical therapy with neck and back exercises. (Doc. 72 ¶ 39; Doc. 89 ¶ 39).

The parties disagree concerning a number of DOC policies and practices. According to the Commonwealth defendants, if an over-the-counter medication is available through commissary, an inmate must purchase the medicine through commissary. (Doc. 72 ¶ 45). Hampton counters that if an over-the-counter

medication is available through commissary, an inmate "may" purchase the medication through commissary. (Doc. 89 ¶ 45). Hampton further avers that Tylenol is not available for purchase through commissary. (Id.)

The Commonwealth defendants state that defendants Koltay and Bernard were employed by outside vendors pursuant to a contract with the DOC. (Doc. 72 ¶ 46). Hampton disputes whether medical personnel may be employed by outside vendors. (Doc. 89 ¶ 46). The Commonwealth defendants maintain that defendant Williams does not provide daily medical care to inmates at SCI-Rockview. (Doc. 72 ¶ 47). Hampton disputes this statement and asserts that Williams treated him for the flu virus in years past. (Doc. 89 ¶ 47).

The parties also disagree anent the scope of Hampton's grievances. The Commonwealth defendants state that Hampton never filed a grievance regarding defendant Harpster's purported refusal to allow him to participate in an exercise program, cardio sessions, rehabilitation program, and physical therapy. (Doc. 72 ¶ 60). Hampton explains that at the time he filed his grievance, he did not know that defendant Harpster "played an affirmative role in refusing Plaintiff all activities." (Doc. 89 ¶ 60). The Commonwealth defendants also state that Hampton never filed a grievance concerning actions taken by defendants Glunt and Wetzel. (Doc. 72 ¶¶ 61-62). Hampton rejoins that he "mentioned" Glunt in a grievance appeal, but "agrees that he did not grieve defendant Wetzel's actions and/or inactions." (Doc. 89 ¶¶ 61-62). The Commonwealth defendants lastly contend that Hampton never filed a final appeal with the Secretary's Office of Inmate Grievances and Appeals regarding any change in the procedure for dispensing medication at SCI-Rockview.

(Doc. 72 ¶ 63).  Hampton agrees that he "did not mention by name the dispensing of meds."  (Doc. 89 ¶ 63).

## III.    **Commonwealth Defendants' Motion**

Hampton asserts claims pursuant to the First, Eighth, and Fourteenth Amendments, the Americans with Disabilities Act, and the Rehabilitation Act against each of the Commonwealth defendants.  (See Doc. 13).  The court will address several threshold issues before turning to Hampton's claims *seriatim*.

### A.    **Exhaustion of Administrative Review**

Defendants Glunt, Harpster, and Wetzel seek summary judgment on the ground that Hampton failed to properly exhaust his claims against them.  (Doc. 78 at 11-15).  Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions. See 42 U.S.C. § 1997e(a); Booth v. Churner, 206 F.3d 289, 291 (3d Cir. 2000).  This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002). The exhaustion requirement is mandatory.  See Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth v. Churner, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement applies to grievance procedures "regardless of the relief offered through administrative procedures"); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (same).  "[I]t is beyond the power of [any] court . . . to excuse compliance

with the exhaustion requirement." Id. at 73 (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. See Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of administrative remedies, but also substantial compliance with procedural requirements. Id. at 227-32; see also Nyhuis, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. Spruill, 372 F.3d at 227-32; see also Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). Failure to identify a named defendant on a grievance form, absent a "justifiable excuse," constitutes failure to properly exhaust as to that defendant. Williams v. Pa. Dep't of Corr., 146 F. App'x 554, 557 (3d Cir. 2005) (non-precedential).

The DOC has an Inmate Grievance System, set forth in DC-ADM 804, which permits any inmate to seek review of problems that may arise during the course of confinement. See 37 Pa. Code § 93.9(a); Pa. Dep't of Corr., No. DC-ADM 804; (see also Doc. 72 ¶¶ 48-49; Doc. 89 ¶¶ 48-49). After an attempt to resolve any problems informally, an inmate may submit a written grievance to the Facility's Grievance Coordinator for initial review. This must occur within fifteen days after the events upon which the claims are based. Within fifteen days of an adverse decision by the Grievance Coordinator, an inmate may then appeal to the Facility Manager of the institution. Thereafter, within fifteen days of an adverse decision by the Facility Manager, an inmate may file a final appeal to the Secretary's Office of Inmate

Grievances and Appeals. An appeal to final review cannot be completed unless an inmate complies with all established procedures. An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue. See Booth, 206 F.3d at 293 n. 2 (outlining Pennsylvania's grievance review process); Ingram v. SCI Camp Hill, 448 F. App'x 275, 279 (3d Cir. 2011) (same).

As noted *supra*, the standard used to determine when a prisoner has exhausted the administrative process is whether he complied with applicable grievance procedures and rules. The relevant policy and the pertinent language states as follows:

> The text of the grievance must be legible, understandable, and presented in a courteous manner. The inmate must include a statement of the facts relevant to the claim. The statement of facts shall include the date, approximate time and location of the event(s) that gave rise to the grievance. The inmate shall identify individuals directly involved in the event(s).

DC-ADM 804, § 1(A)(11). Notably, "[t]he inmate shall identify individuals directly involved in the event(s)." DC-ADM 804, § 1(A)(11). The purpose of the regulation "is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing." Spruill, 372 F.3d at 234.

Helen Shambaugh, an administrative officer in the Secretary's Office of Inmate Grievances and Appeals, has submitted a declaration under penalty of perjury stating that, based on review of the DOC's Inmate Grievance Tracking System, Hampton never filed a grievance alleging negative actions by defendants Harpster, Glunt, or Wetzel. (See Doc. 72-1 at 188-192, Decl. of Helen Shambaugh

("Shambaugh Decl.") ¶¶ 1, 13-18). Shambaugh's review also revealed that Hampton never filed a final appeal regarding changes in the procedures for dispensing medication in the med-line at SCI-Rockview. (See Shambaugh Decl. ¶ 19). Accompanying Shambaugh's declaration are copies of the relevant institutional administrative remedy records. (Doc. 72-1 at 193-441).

The Commonwealth defendants first argue that Hampton never filed a grievance regarding defendant Harpster's alleged refusal to allow Hampton to participate in an exercise program, cardio sessions, rehab program, and physical therapy. (Doc. 72 ¶ 60; Doc. 78 at 13; Doc. 94 at 3). Hampton does not dispute that he failed to name Harpster in any grievance. (Doc. 89 ¶ 60; Doc. 90 at 2-3). In an attempt to excuse this deficiency, Hampton explains that he did not know Harpster played a role in denying him activities when he filed his grievances. (Doc. 89 ¶ 60; Doc. 90 at 2-3). Hampton claims that it would have been "pointless" to initiate the grievance process against Harpster because his prior grievances were denied, and any new grievance would likewise be denied. (Doc. 90, at 2).

Hampton supposedly learned that Harpster denied him access to activities, however Hampton took no action to remedy the defect in his grievances. Even if the court were to excuse Hampton's failure to name Harpster in his grievances, there is no evidence that Hampton filed a grievance related to the underlying claims against Harpster. The undisputed evidence establishes that Hampton has not properly followed grievance procedure with respect to his claims against Harpster by admittedly failing to name him in any grievances. Nor has Hampton offered a "justifiable excuse" for failing to do so. See Williams, 146 F. App'x at 557. As a

18

consequence, the court finds that Hampton has failed to exhaust his claims against Harpster.

The Commonwealth defendants next argue that Hampton never filed a grievance regarding actions taken by defendant Glunt. (Doc. 72 ¶ 61; Doc. 78 at 13-14; Doc. 94 at 4). Hampton counters that he mentioned Glunt in a grievance appeal. (Doc. 89 ¶ 61; Doc. 90 at 3). On final appeal of grievance number 518679, Hampton claimed: "Williams' and *now Glunt's* 'conservative medical approach' is to deny me access to programs that can help relieve my pain." (Doc. 72-1 at 266 (emphasis added)). Pursuant to DC-ADM 804, "only an issue that was raised for Initial Review, determination of frivolousness, rejection and/or placement on grievance restriction may be appealed." DC-ADM 804, § 2.A.1.c. Hampton's grievance plainly shows that he never raised issues pertaining to Glunt for initial review, but only complained of his actions in a final appeal. Hence, Hampton has failed to exhaust his claims against Glunt.

The Commonwealth defendants also argue that Hampton never filed a grievance regarding any actions of defendant Wetzel. (Doc. 72 ¶ 62; Doc. 78 at 14; Doc. 94 at 4). Hampton "agrees that he did not grieve defendant Wetzel's actions and/or inactions." (Doc. 89 ¶ 62). Rather than provide evidence that he properly exhausted administrative remedies concerning his claims against Wetzel, Hampton asserts that Wetzel was aware of the claims herein based on his office's denial of grievances and Hampton's personal letters to Wetzel. (Doc. 90 at 3). Hampton has not provided any evidence that these grievance denials were related to Wetzel's

actions.  The uncontroverted evidence reflects that Hampton has not followed proper grievance procedure against defendant Wetzel.

Finally, the Commonwealth defendants argue that Hampton never filed a final appeal to the Secretary's Office of Inmate Grievances and Appeals regarding any change in the procedure for dispensing medication at SCI-Rockview.  (Doc. 72 ¶ 63).  In the amended complaint, Hampton alleges he was in pain due to the policy of Wetzel, Glunt, and Williams regarding dispensation of medications to inmates with a stability code D status, which precluded him from keeping medication on his person.  (Doc. 13 ¶¶ 22-23).  Hampton provides no evidence that he properly grieved this claim and agrees that he "did not mention by name the dispensing of meds." (Doc. 89 ¶ 63).  The court finds that Hampton has failed to exhaust this claim.

The court concludes that Hampton has failed to exhaust administrative remedies with respect to his claims against defendants Harpster, Glunt, and Wetzel, as well as his claim regarding the policy and procedure for the administration of medication at SCI-Rockview.  Accordingly, the court will enter summary judgment in favor of each of these defendants.

## B.     Official Capacity Claims

The Commonwealth defendants next argue that any claims seeking monetary damages against them in their official capacities are barred by the Eleventh Amendment.  (Doc. 78 at 22-23).  Personal capacity suits under section 1983 seek to recover money from a government official, as an individual, for acts performed under color of state law.  Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988).  Official capacity suits, in contrast, generally represent an action against an

entity of which the government official is an agent. Id.; see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, n. 55 (1978). When suits are brought against state officials in their official capacities, those lawsuits are treated as suits against the state. Hafer v. Melo, 502 U.S. 21, 25 (1991). However, the doctrine of sovereign immunity, established by the Eleventh Amendment, protects states, such as the Commonwealth of Pennsylvania, from suits by citizens. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-01, 117 (1984); Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996); Lavia v. Pennsylvania, 224 F.3d 190, 195-96 (3d Cir. 2000). That immunity runs to state officials if they are sued in their official capacity and the state is the real party upon which liability is sought. Scheuer v. Rhodes, 416 U.S. 232, 237-38 (1974). Congress has not abrogated the immunity regarding Hampton's claims, nor has the Commonwealth of Pennsylvania waived this grant of immunity. See 42 PA. STAT. AND CONS. STAT. ANN. § 8521(b). Hence, Hampton's claims for money damages against the Commonwealth defendants in their official capacities are barred by sovereign immunity. See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 254 (3d Cir. 2010).

### C.   Americans with Disabilities Act and Rehabilitation Act Claims

The Commonwealth defendants also move for summary judgment with respect to Hampton's claims under the Americans with Disabilities Act ("ADA") and Rehabilitation Act. Under both statutes, "the substantive standards for determining liability are the same." McDonald v. Pa. Dep't of Pub. Welfare, 62 F.3d 92, 95 (3d Cir. 1995). However, the Rehabilitation Act also requires plaintiff to show

that the he was excluded from a "program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines "public entity" as: "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49)." Id. § 12131(1). State prisons "fall squarely within" the ADA's definition of "public entity." Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998). However, the plain language of § 12132 applies only to public entities, not individuals. Yeskey v. Commonwealth, 76 F. Supp. 2d 572, 575 (M.D. Pa. 1999). The court finds that the Commonwealth defendants do not qualify as public entities as defined by the ADA. Therefore, the ADA is inapplicable to the individually named Commonwealth defendants, and their motion for summary judgment will be granted on this ground.

### D.    Constitutional Claims

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

22

> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

The Commonwealth defendants raise the defense of qualified immunity in answer to Hampton's § 1983 claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244). Although qualified

immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity.  Giles v. Kearney, 571 F.3d 318, 325-26 (3d Cir. 2009).

A court evaluating a claim of qualified immunity considers two distinct inquiries: first, whether, based on the facts alleged, a constitutional right has been violated and, second, if so, whether the right was "clearly established" at the time of the alleged violation.  Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).  A court may begin its qualified immunity analysis with either prong.  See Pearson, 555 U.S. at 237.  We begin with the first.

### 1. *Eighth Amendment*

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  See Estelle v. Gamble, 429 U.S. 97, 103-05 (1976).  In order to establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." Monmouth Cty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  In addition, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the

medical need is of the serious nature contemplated by the eighth amendment." Id. (citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. See Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); see also McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

a.    **Defendant Williams**

Individual liability can be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through . . . personal direction or . . . actual knowledge and acquiescence." Rode, 845 F.2d at 1207-08; see Rizzo v. Goode, 423 U.S. 362 (1976); Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003). A mere hypothesis that an individual defendant had personal knowledge or involvement in

depriving the plaintiff of his rights is insufficient to establish personal involvement. Rode, 845 F.2d at 1208.

Hampton acknowledges that he is suing defendant Williams because he "supervises the medical contractors and is responsible for them and their actions or inactions." (Doc. 90 at 6). He further asserts that Williams, in his role as medical supervisor, "has the authority to set, make and change policies, procedures, and regulations that effect [sic] the medical department." (Id. at 5). Hampton's claims are, in essence, nothing more than an assertion of *respondeat superior* liability which seeks to hold this defendant liable based on his supervisory role. This ground of constitutional liability has been squarely rejected by the courts. See Rode, 845 F.2d at 1207. Moreover, Hampton has offered no evidence to support his claim that Williams has the authority to create and enact policies for the medical department. Instead, Hampton surmises that because Williams has the ability to respond to grievances, he must have the authority to create policies. (Doc. 90 at 5).

Defendant Williams is the Health Care Administrator at SCI-Rockview. (Doc. 72-1 at 9 ¶ 1). In this role, Williams does not provide daily medical care to inmates, and he defers all decisions regarding diagnosis and treatment of inmates to the contracted provider. (Id. at 10 ¶¶ 4-5). It is clear from the record that Williams did not medically treat Hampton for his back and wrist complaints.[3] Hampton fails to offer any evidence to dispute this fact. The party adverse to summary judgment

---

[3] Hampton asserts that although Williams does not provide daily care to inmates, he provides "some" care. (Doc. 90 at 6). For example, Hampton claims that defendant Williams briefly treated him for the flu virus in 2011 or 2012. (Doc. 93 at 2 ¶¶ 11-13).

must raise "more than a mere scintilla of evidence in its favor" and cannot survive Rule 56 scrutiny by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). Hampton has failed to demonstrate a genuine issue of fact as to whether Williams was deliberately indifferent to Hampton's serious medical needs.

To the extent that Hampton attempts to hold defendant Williams liable based on his involvement in the grievance procedure, this claim also fails. "[T]he failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional violation." McEachin v. Beard, 319 F. Supp. 2d 510, 515 (E.D. Pa. 2004) (quoting Gordon v. Vaughn, No. 99-1511, 1999 WL 305240, at *2 (E.D. Pa. May 12, 1999)). Thus, insofar as Williams is sued for denying Hampton's grievances, dissatisfaction with responses to an inmate's grievances does not support a constitutional claim. See Alexander v. Gennarini, 144 F. App'x 924, 925 (3d Cir. 2005) (concluding that "involvement in the post-incident grievance process" is not a basis for § 1983 liability); Cole v. Sobina, No. 04-99J, 2007 WL 4460617, at *5 (W.D. Pa. 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern."). Judgment will be entered in favor of defendant Williams on the Eighth Amendment claim.

### b. **Defendant McHenry**

Hampton has also raised an Eighth Amendment claim against defendant McHenry for allegedly destroying his back and wrist braces. On February 18, 2014, Hampton was transferred to the RHU at SCI-Rockview and subjected to a strip search. (Doc. 72 ¶¶ 12-13; Doc. 89 ¶¶ 12-13). In conjunction with the search,

Hampton admits that he gave his back brace to correctional officer Montgomery under the supervision of Lieutenant Smith. (Doc. 72 ¶ 14; Doc. 89 ¶ 14). Hampton further admits that defendant McHenry was not present for the strip search. (Id. ¶ 15). Jeffrey Rackovan, Corrections Superintendent's Assistant at SCI-Rockview, states in a declaration that video of Hampton entering the RHU confirms that he gave his brace to correctional officer Montgomery. (Doc. 72-1 at 2-3, Decl. of Jeffrey Rackovan ("Rackovan Decl.") ¶¶ 1, 5). Rackovan further declares that McHenry was not present when Hampton entered the RHU. (Id. at ¶ 5). The parties dispute whether McHenry was ever in possession of Hampton's back brace and wrist splints. (Doc. 72 ¶ 16; Doc. 89 ¶ 16).

In response to Hampton's interrogatories, McHenry states that he inventoried Hampton's property on February 21, 2014, a DC-153 inventory sheet was completed, and a copy of the inventory sheet would have been provided to Hampton when he was released from the RHU. (Doc. 93 at 45-46). Hampton maintains that McHenry completed an inventory of his property on February 21, 2014 but never completed a DC-153 Inmate Personal Property Inventory form. (Doc. 90 at 6). Shortly thereafter, Hampton prepared for a brief transfer to SCI-Benner, and the parties agree that Hampton packed all of his own property in preparation for the transfer. (Doc. 72 ¶ 17; Doc. 89 ¶ 17). On February 25, 2014, Hampton was transferred to the RHU at SCI-Benner and remained there until his return to SCI-Rockview on March 14, 2014. (Doc. 72 ¶ 18; Doc. 89 ¶ 18). The parties agree that Hampton's property was inventoried on March 18, 2014, after his return to SCI-Rockview. (Doc. 72 ¶ 19; see Doc. 89 ¶ 19).

Hampton did not discover that his property was missing until March 18, 2014. (Doc. 72 ¶ 20; Doc. 89 ¶ 20). Hampton states that when the inventory was completed on that day, the prior inventory form from February 21, 2014 could not be located. (Doc. 93 at 48). Thus, Hampton speculates that the lack of an inventory sheet from February 21, 2014 necessarily proves that McHenry destroyed his property. (Doc. 90 at 7).

The court disagrees. No reasonable juror could conclude from this evidence that defendant McHenry destroyed Hampton's property. Indeed, Hampton does not present "evidence" at all—only hypothesis and accusation based on the lack of an inventory sheet for the February 21, 2014 transfer. Hampton cannot satisfy his burden with conjecture and supposition. See Betts, 621 F.3d at 252 (citing Williams, 891 F.2d at 460); Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at 325). Rule 56 requires affirmative evidence in support of a claim. See FED. R. CIV. P. 56(e). The record is devoid of any such corroborative evidence. The court will grant summary judgment to defendant McHenry on this Eighth Amendment claim.

### 2. *Fourteenth Amendment*

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. This prohibition is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)). To state an equal protection claim, a plaintiff generally must allege that he or she is

a member of a protected class and was treated differently from similarly-situated persons outside of that class.  See id. at 440.

An equal protection claim can also be brought by a "class of one." See Renchenski v. Williams, 622 F.3d 315, 337-38 (3d Cir. 2010) (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Phillips v. Cty. of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008)).  The Supreme Court defines a class of one as a plaintiff alleging he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Olech, 528 U.S. at 564 (2000); see also Jean-Pierre v. Bureau of Prisons, 497 F. App'x 164, 168 (3d Cir. 2012).  "If a distinction between persons does not implicate a suspect or quasi-suspect class, state action will be upheld if it is rationally related to a legitimate state interest."  Jackson v. Gordon, 145 F. App'x 774, 777 (3d Cir. 2005) (citing Tillman v. Lebanon Cty. Corr. Facility, 221 F.3d 410, 423 (3d Cir. 2000)).

Hampton does not state that he is a member of a protected class.  Indeed, prisoners are not a protected class of individuals.  See Abdul-Akbar v. McKelvie, 239 F.3d 307, 317 (3d Cir. 2001).  Therefore, Hampton's claim survives only if he has properly established a violation of his equal protection rights under a class-of-one theory.  To survive under the class-of-one theory, Hampton must establish that he has been treated differently from similarly situated inmates, that the defendants did so intentionally, and that this difference in treatment bears no rational relation to any legitimate penological interest.  See Phillips, 515 F.3d at  243 (quoting Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006)).

Hampton claims that the Commonwealth defendants violated his Fourteenth Amendment rights "by intentionally discriminating against [h]im and not treating him equal as everyone else." (Doc. 13 ¶ 32). Hampton fails to present any evidence tending to establish that the defendants engaged in any intentional or purposeful discrimination or that he was treated differently than similarly situated persons on the basis of his age, race, nationality or gender. Instead, he speculates that the defendants "did not like [him] and all the grievances he filed . . . , nor did they like the filing of civil lawsuits." (Doc. 90 at 7-8). Such spare allegations do not suffice at the Rule 56 stage. See Betts, 621 F.3d at 252 (citing Williams, 891 F.2d at 460); Podobnik, 409 F.3d at 594 (quoting Celotex Corp., 477 U.S. at 325).

Hampton does submit an affidavit from a fellow inmate wherein the inmate states that he was permitted to participate in certain activities, despite his medical restrictions, after he signed a waiver. (Doc. 93-2 at 38-39). But Hampton admits that medical staff offered him the same option, i.e., he may lift certain restrictions in order to participate in other desired activities. (See Doc. 72 ¶ 4; Doc. 89 ¶ 4; Doc. 74 ¶ 11). Hampton admittedly refused to sign a waiver lifting all restrictions. (Doc. 89 ¶ 4). Hampton accordingly fails to establish that he was treated differently than similarly situated inmates. Rather, the evidence establishes that Hampton was subject to a prison policy that affected all inmates similarly. The Commonwealth defendants are entitled to summary judgment on the equal protection claim.

### 3. *First Amendment*

Hampton also states a First Amendment retaliation claim against the Commonwealth defendants. The First Amendment offers protection for a wide

variety of expressive activities.  <u>See</u> U.S. CONST. amend I.  These rights are lessened, but not extinguished, in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. <u>See</u> <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  <u>See</u> <u>Allah v. Seiverling</u>, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate: (1) that he was engaged in constitutionally protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  <u>Rauser v. Horn</u>, 241 F.3d 330 (3d Cir. 2001) (quoting <u>Allah</u>, 229 F.3d at 225).

Hampton asserts that the alleged retaliatory conduct by "defendant Williams or the PAs" was undertaken in response to his filing of inmate grievances.  (Doc. 90 at 13; <u>see</u> <u>also</u> Doc. 13 ¶ 28).  The filing of grievances is protected activity under the First Amendment right of prisoners to petition the court.  <u>See</u> <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003) (collecting cases).  Thus, the first prong of <u>Rauser</u>—that the plaintiff be engaged in a constitutionally protected activity—is satisfied.

Once it is determined that the inmate was engaged in protected conduct, he must show that he has suffered some adverse action at the hands of prison officials. <u>See</u> <u>Rauser</u>, 241 F.3d at 333 (citing <u>Allah</u>, 229 F.3d at 225).  To establish an "adverse action," the plaintiff must demonstrate that defendants' actions were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." <u>Allah v. Al-Hafeez</u>, 208 F. Supp. 2d 520, 535 (E.D. Pa. 2002) (quoting <u>Allah</u>, 229 F.3d

at 225).  Hampton alleges that he was the victim of adverse action in the form of the denial of access to activities.  The denial of access to activities constitutes adverse action.  Thus, Hampton satisfies the second Rauser prong.

Under the third prong, the court must determine whether there is a causal connection between the exercise of the constitutional right and the adverse action.  The plaintiff must show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.  Motivation may be shown by establishing "a 'chronology of events from which retaliation plausibly may be inferred.'"  Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996) (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995)); see also Goff v. Burton, 91 F.3d 1188, 1191 (8th Cir. 1996); Pride v. Peters, 72 F.3d 132 (Table) (7th Cir. 1995).  It is plaintiff's burden to prove that defendants were motivated by retaliation.  See Hannon v. Speck, No. 87-3212, 1988 WL 131367, at *4 (E.D. Pa. Dec. 6, 1988) ("In bringing a § 1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor . . . was as he alleged.") (internal quotes and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989) (Table).  Where the prisoner seeks to establish this causal link based upon the temporal proximity between the protected conduct and the alleged retaliatory act, "the timing of the alleged retaliatory action must be unusually suggestive before a causal link will be inferred."  Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); Rauser, 241 F.3d at 334; see also Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003).

Hampton cannot establish a causal link between his grievances and the denial of his participation in certain activities. Hampton claims that he was denied access to activities because he was not assigned a job. (Doc. 13 ¶ 29; Doc. 90 at 12). The relevant policy clearly states that inmates on "Job Suspended, Job Removed, or Refused Job lists" are not eligible to participate in certain recreational programs. (Doc. 93-1 at 19). Hampton fails to provide any evidence that he was denied access to activities out of retaliation for his participation in a constitutionally protected activity. He thus fails to satisfy the third <u>Rauser</u> prong. The Commonwealth defendants are entitled to summary judgment on the retaliation claim.

## IV.    **Bernard and Koltay's Motion**

Hampton's remaining claim against defendants Bernard and Koltay is an Eighth Amendment inadequate medical care claim for discontinuing Hampton's prescription for Tylenol and failing to re-issue his back and wrist braces after they were confiscated. As stated *supra*, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." <u>Rouse</u>, 182 F.3d at 197. In the context of medical care, the relevant inquiry is whether the defendant was deliberately indifferent to the plaintiff's serious medical needs. <u>See</u> <u>Monmouth Cty.</u>, 834 F.2d at 346. The Rule 56 record demonstrates that Hampton received ample medical attention from defendants Bernard and Koltay and that they were not deliberately indifferent to his needs.

Hampton claims defendant Bernard discontinued his prescription for Tylenol as ordered by Dr. Ekizian. (Doc. 13 ¶¶ 8, 25). When Dr. Ekizian treated Hampton on June 3, 2014, he advised Hampton to "try Tylenol/NSAIDs first," and

indicated that there was no previous record of Hampton taking such medications. (Doc. 75-1 at 32). Bernard argues that there is no evidence that Dr. Ekizian wrote a separate order for Tylenol and, thus, no order to discontinue. Hampton concedes that there is no evidence in the prison records of a Tylenol prescription. (Doc. 82 at 6). His "theory" is that Bernard removed his Tylenol prescription from the prison system when she purportedly discontinued the medication. (Id.) But Rule 56 demands more than a "theory" of unsubstantiated allegations. Betts, 621 F.3d at 252 (citing Williams, 891 F.2d at 460); Podobnik, 409 F.3d at 598 (quoting Celotex, 477 U.S. at 325). Rather, Hampton must come forth with "affirmative evidence" in support of his right to relief. Pappas, 331 F. Supp. 2d at 315; FED. R. CIV. P. 56(e). Hampton fails to meet his burden with respect to his claim that defendant Bernard discontinued a Tylenol prescription.

Moreover, the evidence establishes that defendant Bernard continually *encouraged* Hampton to take Tylenol. (Doc. 75-1 at 25, 27). Bernard observes that, pursuant to prison policy, all inmates are to purchase over-the-counter medication, such as Tylenol, from the commissary. The relevant policy provides:

> Medical staff will advise inmates when OTC's (over the counter) medications are available in the commissary. If an inmate elects to receive OTC medications during a sick call visit, co-pay fees will apply. An inmate, who is in need of OTC medications that are not available in the commissary, will be addressed as outlined in Subsection B.1. above.

(Doc. 82 at 45); DC-ADM 820, § B.2. Hampton was specifically advised: "Any medication that is available over the counter, the inmate is expected to purchase their own. You are not singled out for this process." (Doc. 75-3 at 1). The record

establishes that "non-aspirin x-strength 500mg" (i.e., Tylenol) was available for purchase from the commissary. (Doc. 82 at 50). The record is devoid of evidence that Hampton informed Bernard that he could not afford to purchase Tylenol. Thus, Bernard did not exhibit deliberate indifference to Hampton's medical needs when she advised him to obtain over-the-counter medication from the commissary in accordance with official prison policy.

Hampton further claims that defendants Bernard and Koltay were deliberately indifferent to his serious medical needs when they failed to re-issue his back and wrist braces after they were confiscated. The following timeline outlines, in part, Hampton's medical treatment related to his back and wrist braces.

- On February 18, 2014, Hampton's back and wrist braces were confiscated by prison staff when he was transferred to the RHU. (Doc. 13 ¶ 3).

- On May 8, 2014, Hampton first reported to defendant Koltay that his braces were confiscated. (Doc. 75-1 at 35). Defendant Koltay advised Hampton that, pursuant to DOC policy, she could not provide him with new braces unless he had a confiscation slip. (Id.) She advised Hampton to contact security for a confiscation slip and to return to medical for follow-up. (Id.)

- On May 8, 2014, Hampton completed an Inmate's Request to Staff Member form inquiring about obtaining a confiscated items receipt. (Doc. 82 at 25). In response, a staff member advised Hampton that a confiscated items receipt was not required because the confiscated items were state issued property. (Id.)

- On May 19, 2014, Hampton completed an Inmate's Request to Staff Member form directed to defendant Koltay. (Doc. 82 at 27). Hampton reported that prison staff informed him that a confiscated items receipt was not required for his replacement braces. (Id.) In response, defendant Koltay instructed Hampton to sign up for sick call to further discuss the matter. (Id.)

- On May 19, 2014, in response to Hampton's request for the return of his back brace, Dr. Ekizian reviewed Hampton's chart and concluded that he "continue the back brace order for now." (Doc. 75-1 at 36).

- On June 3, 2014, Dr. Ekizian examined Hampton and ordered a new back brace, with an explanation that his old back brace was confiscated when he was transferred to RHU. (Doc. 75-1 at 32).

- On June 23, 2014, defendant Bernard treated Hampton; however, Hampton did not mention back and wrist braces. (Doc. 75-1 at 31).

- July 14, 2014 was the first occasion that Hampton discussed his confiscated braces with defendant Bernard. (Id. at 27). During this examination, Bernard examined Hampton and did not believe that wrist splints were necessary. (Id.)

- On July 30, 2014, Hampton was seen by a physical therapist and complained of back pain. (Doc. 75-1 at 18). Hampton did not report any wrist pain during this visit, and no recommendations were made for back or wrist braces. (Id.)

- On September 22, 2014, defendant Koltay examined Hampton and ordered bilateral wrist splints. (Doc. 75-1 at 25).

The evidence of record establishes that Hampton received extensive medical care related to his back and wrist pain. There is no evidence that Bernard and Koltay failed to treat Hampton or exhibited deliberate indifference to his medical needs. Nor is there evidence that Hampton repeatedly requested replacement braces. Although Koltay initially advised Hampton to obtain a confiscated items receipt for replacement braces, she thereafter instructed Hampton to sign up for sick call to discuss the situation. Subsequent examinations revealed that Hampton either did not report any wrist pain, or that wrist splints were deemed not medically necessary. Moreover, there is no evidence that Hampton suffered any medical emergency during the time that he was without his braces.

Hampton primarily appears to be dissatisfied with the medical care provided by Bernard and Koltay.  Hampton is not entitled to convert his dissatisfaction with that care into a constitutional claim.  Hampton's personal opinions as to the manner in which medical braces should be re-issued, and how Tylenol should be provided to inmates, amount to nothing more than a difference of opinion as to a course of treatment.  But "mere disagreement as to the proper medical treatment" does not amount to a constitutionally cognizable claim.  See Spruill, 372 F.3d at 235 (citing Monmouth Cty., 834 F.2d at 346); see also Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim.").  The court will grant summary judgment in favor of defendants Bernard and Koltay.

**V.   Conclusion**

For the reasons set forth above, the court will grant both motions (Docs. 71, 73) for summary judgment.  An appropriate order will issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      March 10, 2017